[Criminal No. 811.  Filed March 18, 1935.]

[42 Pac. (2d) 615.]

JESSE STEFFANI, Appellant, v. STATE OF ARI-
ZONA, Respondent.

Messrs. Dougherty & Dougherty and Mr. Roy L. Herndon, for Appellant.

Mr. Arthur T. La Prade, Attorney General, Mr. P. H. Brooks, Assistant Attorney General, Mr. John L. Sullivan, Attorney General, and Mr. W. Francis Wilson, Assistant Attorney General, for the State.

ROSS, J.—The defendant Steffani has appealed from a judgment of conviction of manslaughter.

Some time before midnight on May 12, 1933, Harry Manuel and Harry Smith, Indians, were traveling westerly on public highway No. 89 in an old model T Ford truck loaded with wood. They had some tire trouble, and, for the purpose of repairing the tire, parked on the right side of Eighth Street in Tempe, a link in said highway, in front of Dad's Place and opposite the Tempe Teachers' College.

The truck was two or three feet inside the highway from the north curb, and faced westerly, or the direction in which they were going. It had dim headlights, but no tail-lights. The Indians parked the truck in front of and just west of Dad's Place in order to have the electric light thereof to work under. This light was turned out at midnight, and thereafter there was no light, except the headlights on the truck. At about 1:30 A. M., on May 13th, the defendant, with one Loera, was proceeding westerly along said highway and street in defendant's model A Ford sedan, defendant driving, and ran into and against the Indians, killing both of them.

On May 16th the county attorney filed an information against defendant charging him with wilfully, recklessly, unlawfully and feloniously, and while under the influence of intoxicating liquor, running into and against the said Harry Manuel and killing him.

■■ The first assignment of error is based upon the ruling of the court allowing the county attorney to cross-examine defendant's witness, E. O'B. Mann, upon matters not brought out in the examination in chief. Mann, who owned and operated Dad's Place, was asked by defendant to locate the Indians' truck with reference to his place, about the lights on the truck and in front of his place, and about the growth of timber in the neighborhood. It was also elicited from him that the light in front of Dad's Place was turned off at midnight. On cross-examination the county attorney asked Mann, speaking of defendant and Loera, "And what was their condition?" This question was objected to on the grounds that it was not competent cross-examination and was multifarious. The objection was sustained on the last ground, whereupon the cross-examination continued as follows:

"Q. What was the condition of this defendant at the time when you saw him? A. His condition?

"Q. Yes, as to sobriety? A. As to sobriety, did I get you to say?

"Q. Yes. A. I wasn't close enough to the man to definitely state a fact as to his sobriety.

"Q. I see. A. I could only judge by appearances, that is all.

"Q. Well, what was his appearance at the time? A. Well, from the appearances I would judge he was badly under the influence of liquor.

"Q. Badly under the influence of liquor? A. Yes."

Thereafter, counsel for defendant, asserting surprise, was permitted by the court to cross-examine Mann as a hostile or adverse witness. It seems that when the form of the question was changed to apply to defendant only, if he did not wish to have the witness state defendant's condition, he should have renewed his objection that it was improper cross-examination. The failure to object to the question, and the failure to ask that the answer be stricken, was tantamount to a waiver by defendant of any error in the cross-examination. The prosecution unquestionably could have called Mann as its witness, and asked the questions now objected to. The questioning of such witness while he was testifying for defendant, the latter being permitted to cross-examine, only disturbed the general rule as to the order in which evidence should be admitted, and such irregularity could hardly be said to be prejudicial.

Dr. R. J. Stroud was the state's witness. He was called to the scene of the accident and saw defendant and Loera there. Later, at about 2 o'clock in the morning, he treated their wounds at his office, and at the time, or immediately thereafter, made a memorandum, which, on cross-examination by the county attorney, under the permission of the court, was read

to the jury. The court's ruling permitting the prosecution to cross-examine Dr. Stroud, its own witness, and to read the memorandum to the jury for the purpose of impeaching the witness, is assigned as error. The witness, when questioned as to the condition of defendant as to sobriety, stated in effect that he had no independent recollection except that he was under the impression that the defendant was either drunk or dazed; that he could not be more specific. The county attorney, claiming this statement as to defendant's condition was different from what the witness told him a few days before, was given permission to cross-examine the witness. He then asked the witness if he had made notes and, receiving an affirmative answer, there followed these questions and answers:

"Q. And you told me Doctor, from the notes you could recall what the condition of the defendant was. Is that right? A. I told you I wrote my general impression. I told you just these words, 'I will give you my general impression of the two men, not specific.'

"Q. And at that time you could not recollect what the condition was—that is, a week or two ago? A. No, I could neither recollect exactly. Neither could I recollect my notes.

"Q. I see. A. I hadn't looked at the notes from the time they were injured until I saw them when you were there.

"Q. These notes are in your own handwriting? A. Yes, sir.

"Q. Written at two o'clock, after the accident? A. After I had dressed the wounds of the two men who were in the car which was presumed to have hit the Indians. . . .

"Q. Do you have a statement in your notes, Doctor, that you found two drunken Mexicans? A. I wrote this: 'Saturday, the 13th of May, 1933, County of Maricopa. Called at one-fifteen a. m. to review an accident; two dead Indians; two drunk Mexicans;

Jess Steffani, 26, wound in the left thumb; condition of his mouth, some loose teeth; abrasement of right knee which was dressed—.' ''

This witness explained, in answer to questions by defendant's counsel, that one of the men was undoubtedly drunk, and he took it for granted that the two were drunk, and wrote the memorandum the way he did.

■■ As we understand the matter of permitting leading questions in chief to one's own witness is largely discretionary with the trial court, especially so when the answer of the witness has surprised the party calling him. It was under this rule the county attorney was allowed to ask Dr. Stroud leading questions. It does not appear that in giving this permission the court's discretion was abused. 28 R. C. L. 589, §§ 182 and 183.

■■ The rule is that a witness who has no independent recollection of the matters inquired about, but who has kept a written record of it at the time, or near the time, may use such record to refresh his memory. 28 R. C. L. 594, § 185. The converse of this must be true; that if the witness remembers the facts independent of such written record he should not be permitted to use such record, for in that event he would not need to have his memory refreshed. 70 C. J. 582, § 748. Dr. Stroud testified he could not recollect defendant's condition as to sobriety, nor could he recollect his notes thereon. He said he wrote his "general impression." It is evident, we think, the witness had consulted his notes before going on the stand, and that his testimony was a reflection of the memorandum as construed by him. The memorandum should not have been read to the jury by the witness, or at all. It was not itself evidence of the facts, and could not properly be used by the prosecution in corroboration of the witness' testi-

mony. *Springer* v. *Labow*, 108 N. J. L. 68, 155 Atl. 476; 70 C. J. 598, § 770.

However, the witness was not asked what his memorandum was, but whether he kept one, and his answer was not responsive to the question. A motion to strike the answer, under the circumstances, should have been made in order to preserve the right to claim error. *Holman* v. *Edson*, 81 Vt. 49, 69 Atl. 143, 15 Ann. Cas. 1089, and note; 28 R. C. L. 592, § 184.

In harmony with the averments of the information, the court instructed the jury on reckless driving as defined by section 1689 of the Revised Code of 1928, and also as to excessive speed. It is urged by defendant that such instruction was abstract because there was no evidence upon which to base it. No eye-witness testified as to the speed or manner defendant was driving, although at the instant of the crash there were two other automobiles in the neighborhood. Jack Harelson was in one, alone, going east. The other was driven by V. R. Cromb, and was going in the same direction defendant was going, and passed defendant a short distance before reaching the place of the accident, probably a block. E. C. Voss was riding in this car with Cromb, and he testified that when they passed defendant's car it was well on or near the north side of the road and was "weaving . . . swaying from side to side." Cromb and Voss saw the Indians' truck as they passed it, and heard the crash immediately thereafter. Harelson, the driver of the east-bound car, met the Cromb and Voss car about 150 feet west of the truck and at the instant of the accident. They all heard the crash, and immediately went to the scene. They discovered the truck had been driven forward about 14 feet, up over a six-inch curb, facing practically north, with the front wheels on the sidewalk and the right hind

wheel against the curb and the left hind wheel about a foot from the curbing. As a result of the impact, the endgate of the truck was knocked out and probably half of the load of wood had fallen into the street. Harry Manuel was underneath defendant's car, which had overturned, and the other Indian about 15 feet in front of the truck, or 45 feet from where defendant's car struck the truck. The right front end of defendant's car and the left rear end of the truck showed conclusive evidence that these were the parts of the two cars that came together. Both the Indians were almost instantly killed. Defendant's headlights were in good shape. Both sides of the highway at this point are lined with trees, and at the time of the accident there were no street lights. The night, however, was not dark. Harelson testified that at about 1 o'clock, or a half hour before the accident, he passed the truck going west, at which time he saw the truck and also the Indians. Defendant testified that he was driving at the rate of 20 or 25 miles, but that the glare of the headlights of the car coming from the west reflected on his windshield, and that he did not see the Indians or the truck until he was right on them; that he applied his brakes, but it was too late.

The law requires one operating an automobile on the public highway at all times to have it under control, and this is especially true where cars are approaching each other, from different directions, with bright headlights calculated to interfere with one's vision. A speed under such circumstances might be reckless and wanton which in the absence of such blinding headlights would be reasonable and prudent. So we cannot say, as a matter of law, that the court was not justified in submitting the question of speed and recklessness to the jury.

■ The instruction is also said to be erroneous and misleading in the statement of the law relating to criminal negligence. The instruction seems to be a correct embodiment of the law governing the operation of automobiles on the public highways. It incorporates the substance of section 1689, *supra*, which provides that one driving a motor vehicle on the highway without due caution, and at a speed or in a manner endangering or likely to endanger any person or property, is guilty of a misdemeanor.

Involuntary manslaughter consists of the unlawful killing of a human being in the commission of "an unlawful act . . . not amounting to felony. . . ." *Gutierrez* v. *State,* 44 Ariz. 114, 34 Pac. (2d) 395, 396. The instruction submitted to the jury that if defendant was committing a misdemeanor at the time he killed Manuel, in other words, if he was driving without due caution or in a manner endangering life, then he was guilty of criminal negligence, and that if they found that such negligence was the proximate cause of Manuel's death they might find defendant guilty. We believe the instruction fairly stated the law.

■ There were several witnesses who testified that defendant and his companion Loera were both drunk, or much under the influence of intoxicating liquor. A broken bottle, smelling of liquor, was found on the running board of defendant's automobile. Section 1688, Revised Code of 1928, makes it a misdemeanor for any person to drive an automobile upon any highway while under the influence of intoxicating liquor. Therefore, the question of the condition of the defendant at the time of the accident became important. The court instructed the jury as follows on that question:

"The expression 'under the influence of intoxicating liquor' covers not only all the well-known and easily recognized conditions and degrees of intoxi-

cation, but any abnormal mental or physical condition which is the result of indulging in any degree in intoxicating liquors, and which tends to deprive him of that clearness of intellect and control of himself which he would otherwise possess. If the ability of the driver of an automobile has been lessened in the slightest degree by the use of intoxicating liquors, then the driver is deemed to be under the influence of intoxicating liquor. The mere fact that a driver has taken a drink does not place him under the ban of the statute unless such drink has some influence upon him lessening in some degree his ability to handle said automobile.''

Defendant now contends that the above definition of the term ''under the influence of intoxicating liquor'' is erroneous. We think the instruction given is in conformity with the law as stated by this court in *Hasten* v. *State*, 35 Ariz. 427, 431, 280 Pac. 670, 671, wherein we said:

''It is a truism that a person who is even to the slightest extent 'under the influence of liquor,' in the common and well-understood acceptation of the term, is to some degree at least less able, either mentally or physically or both, to exercise the clear judgment and steady hand necessary to handle as powerful and dangerous a mechanism as a modern automobile with safety to himself and the public. With the increasing number and speed of automobiles on our highways, and the appalling number of accidents resulting therefrom, it is not strange that the law-making power determined that any person, who of his own free will voluntarily lessened in the slightest degree his ability to handle such vehicles by the use of intoxicating liquor, should, while in such condition, be debarred from their use. The legislature has placed no limitation on the extent of the influence required, nor can we add to their language.''

The defendant submitted an instruction which he contends gave the correct definition of the phrase ''under the influence of intoxicating liquor,'' and in-

sists that the court erred in refusing to give it. Since this definition does not conform with the rule laid down in *Hasten* v. *State, supra,* it was not error to refuse to give it.

▇▇▇ The defendant also complains of the court's refusal to instruct the jury, upon his request, as follows:

"You are instructed, gentlemen, that 'criminal negligence' implies more than ordinary negligence. It is not sufficient that defendant may have merely failed to exercise that degree of care which an ordinarily cautious man would have exercised under like circumstances. But to find that this defendant was criminally negligent, you must be satisfied beyond a reasonable doubt that he was grossly or wantonly negligent. Gross negligence is conduct which is reckless and wholly regardless of the lives and safety of others."

It is said this instruction should have been given to inform the jury as to the difference between civil and criminal negligence. It may be granted defendant was entitled to have the distinction between the two kinds of negligence stated to the jury, but not necessarily in his own language. The point was covered by the court's general instructions.

▇▇▇ Finally, it is asserted the court erred in denying defendant's motion for a new trial, for the reason that the evidence is conclusive (1) that the proximate cause of Manuel's death was his own negligence, and (2) that defendant was not guilty of criminal negligence, or under the influence of intoxicating liquor. If the defendant's premise, that there was no evidence to support a finding of criminal negligence or that he was intoxicated or that his criminal negligence or intoxication was not the proximate cause of Manuel's death, was correct, then the motion for a new trial should have been granted. However, we think there is substantial evidence on all these issues

to support the jury's finding, and since the jury is the trier of the facts its conclusion will not be disturbed. The jury is the judge of the weight of the evidence and the credibility of the witnesses.

We have carefully examined the record and defendant's assignments, and have come to the conclusion that the defendant had a fair and impartial trial.

The judgment is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.