193 P.3d 409

STATE of Hawai'i, Plaintiff–
Appellee–Respondent,

v.

Anthony KASSEBEER Jr., Defendant–
Appellant–Petitioner.

No. 27660.

Supreme Court of Hawai'i.

Sept. 30, 2008.

Stephen K. Tsushima, Deputy Prosecuting Attorney, for the plaintiff-appellee-respondent State of Hawai'i.

Joseph R. Mottl III, for the defendant-appellant-petitioner Anthony Kassebeer Jr.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, AND DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

On May 29, 2008, the defendant-appellant-petitioner Anthony Kassebeer, Jr., filed an application for a writ of certiorari, urging this court to review the memorandum opinion of the Intermediate Court of Appeals (ICA) in *State v. Kassebeer,* No. 27660, 118 Hawai'i 209, 187 P.3d 593, 2008 WL 606932 (Hawai'i Ct.App. February 29, 2008) (ICA's mem. op.). The ICA affirmed the November 16, 2005 judgment of conviction and sentence of the circuit court of the first circuit, the Honorable Dexter D. Del Rosario presiding, convicting Kassebeer of sexual assault in the first degree, in violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(a) (Supp.2003),[1] and kidnapping, in violation of HRS § 707–720(1)(e) (1993).[2] Kassebeer raises the following arguments: (1) he was denied his constitutional right to a fair trial through cumulative errors by the circuit court; (2) the circuit court erred in admitting Kassebeer's handgun into evidence; (3) the circuit court erred in admitting into evidence testimony of a prior incident of physical abuse by Kassebeer against Kassebeer's wife at the time of the incident (the complainant); (4) the circuit court failed to deliver a specific unanimity instruction as to the charge of kidnapping; (5) the circuit court erred in communicating its opinion that an offense had actually been committed; (6) the circuit court erred in preventing Kassebeer from effectively confronting and cross-examining witnesses called by the plaintiff-appellee-respondent State of Hawai'i (the prosecution); and (7) the circuit court erred in refusing to grant Kassebeer's three motions for mistrial.

For the reasons that follow, we hold that the ICA erred in concluding (1) that the circuit court did not plainly err when it failed to include a specific unanimity instruction regarding the kidnapping charge and (2) that the circuit court did not prevent Kassebeer from effectively confronting and cross-examining the complainant. We therefore vacate the ICA's March 28, 2008 judgment and the circuit court's November 16, 2005 judgment. This matter is remanded to the circuit court for a new trial on the first degree sexual assault and kidnapping counts.

## I. *BACKGROUND*

At the time of the trial, Kassebeer and the complainant were divorced, but they had previously been married for over six years and had two children. They had shared a residence in Pearl City (the residence) until mid-March 2004, when Kassebeer voluntarily moved out due to marital problems. Kassebeer went to live with his sister, Krystal Kassebeer. Kassebeer and the complainant kept in contact following the separation, including continued sexual relations "at least once or twice," the last instance occurring a week prior to the events at issue. Kassebeer and the complainant were involved in incidents on the evening of April 9, 2004, the early morning of April 10, 2004, and the afternoon of April 10, 2004, the facts of which were disputed at trial.

On April 13, 2004, an O'ahu grand jury returned an indictment charging Kassebeer with sexual assault in the first degree, in violation of HRS § 707–730(1)(a), sexual assault in the third degree, in violation of HRS § 707–732(1)(f) (Supp.2004),[3] and kidnapping, in violation of HRS § 707–720(1)(e).

1. HRS § 707–730(1)(a) provides:

 (1) A person commits the offense of sexual assault in the first degree if:
 (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion....

2. HRS § 707–720(1) provides:

 (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
 (a) Hold that person for ransom or reward;
 (b) Use that person as a shield or hostage;
 (c) Facilitate the commission of a felony or flight thereafter;

 (d) Inflict bodily injury upon that person or subject that person to a sexual offense;
 (e) Terrorize that person or a third person; or
 (f) Interfere with the performance of any governmental or political function.

3. HRS § 707–732(1)(f) provides:

 (1) A person commits the offense of sexual assault in the third degree if:
 ....
 (f) The person knowingly, by strong compulsion, has sexual contact with another person or causes another person to have sexual contact with the actor.

Prior to the commencement of trial, the circuit court heard motions *in limine* from both parties. The circuit court ruled that all testimony regarding the complainant's use of or trafficking in illegal drugs be excluded, except for her use of drugs that would affect her ability to perceive or remember events on the dates of the incidents. Kassebeer argued that the incident that occurred in the early morning of April 10, 2004 constituted a prior bad act that should be excluded under Hawai'i Rules of Evidence (HRE) Rule 403 [4] due to its "minimal probative value and exceedingly great prejudice." The circuit court ruled that all testimony concerning alleged prior incidents of physical, emotional, or verbal abuse by Kassebeer against the complainant be excluded, with an exception for the alleged use of force by Kassebeer against the complainant on the early morning of April 10. Following jury selection, the trial began on August 5, 2005.

## A. *Trial*

At trial, the prosecution called Honolulu Police Department (HPD) Officer Barbara Donato, Andrew Kim (Kim), HPD Detective Dennis Kim (Detective Kim), Tabatha Hashimoto–Matautia, and the complainant as witnesses. The defense called Krystal Kassebeer, Nadine Tan–Salle, M.D., and Kassebeer as witnesses. The following facts are taken from the testimony adduced at trial and are organized by incident.

### 1. *The April 9, 2004 late night incident*

Kassebeer, Andrew Kim, and Christopher Freitas were driving around Waikīkī on the night of April 9, 2004, when they saw the complainant's truck going towards the Hilton Hawai'ian Village (the Hilton). They followed the truck to the Hilton because Kassebeer suspected that the complainant was driving to rendezvous with another man, but she was in fact going there to pick up Hashimoto–Matautia, who worked in one of the stores located within the Hilton.

At the Hilton, Kassebeer attempted to talk with the complainant, who refused to roll down her window. Kassebeer noticed that the complainant had a black eye and an injured lip, so he inquired as to how she received the injuries, but the complainant became upset and told Kassebeer to leave her alone. The complainant attempted to drive off, which prompted Kassebeer to jump into the bed of her truck; eventually, she allowed him to enter the truck.

Once inside the truck, Kassebeer renewed his inquiry with respect to her injuries, and she responded that she had fallen down some stairs at a nightclub. When Hashimoto–Matautia arrived at the scene, Kassebeer asked her how the complainant had received the injuries, to which Hashimoto–Matautia responded that the complainant had fallen off a stool at her house. Kassebeer testified that these conflicting accounts regarding the cause of the complainant's injuries led him to suspect that the complainant and Hashimoto–Matautia were hiding something. The complainant and Hashimoto–Matautia testified that Kassebeer declared that, if he could not have the complainant, then no one could and that he would make everyone's life miserable.

Hashimoto–Matautia and the complainant left the Hilton in the complainant's truck, but Kassebeer and his friends followed them. According to the complainant's and Hashimoto–Matautia's testimony, Kassebeer phoned the complainant and accused her of dating one of Hashimoto–Matautia's co-workers. In his testimony, Kassebeer denied making the phone call. After unsuccessfully trying to elude Kassebeer's car, the complainant drove back to the Hilton, where she called the police. However, by the time the police arrived, Kassebeer was nowhere to be found.

### 2. *The April 10, 2004 early morning incident*

Andrew Kim and Kassebeer testified that immediately after the incident at the Hilton,

---

4. HRE Rule 403, entitled "Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time," states in full:

Although relevant, evidence may be excluded if its probative value is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

they traveled to the complainant's apartment in order to search for evidence that the complainant was sleeping with another man. They went through the complainant's laundry and placed a piece of scotch tape on the rear sliding door of the apartment so that they could determine whether the complainant was sneaking another man into the home through the back door. They also discovered a blurry photograph that appeared to depict a man and woman engaging in a sexual act. Kassebeer testified that, unbeknownst to Kim, he had brought his handgun into the residence and had placed it under the bed because he did not know what to expect and he thought that there might be a confrontation with the man he believed had beaten up the complainant.

While the search was underway, Hashimoto–Matautia and the complainant were driving home separately after the incident at the Hilton. Hashimoto–Matautia testified that, at approximately 2:00 a.m., she was talking to the complainant on her cellular phone when she heard the complainant scream, "[O]h, my gosh." The call ended abruptly. The complainant testified that on the other end of the line the following sequence of events occurred. She had entered her home and was shocked to see Kassebeer in her hallway. He proceeded to grab her from behind, cover her mouth with his hands in order to muffle her screams, and drop her to the ground. Slamming her head against the tile, he asked, "[W]ho are you fucking? Who are you fucking[?]" He tore the cellular phone away from her ear, hit her across the chin with the phone, and resumed his inquisition regarding her sexual activities.

Kassebeer and Andrew Kim testified to a different version of this encounter. By their account, Kassebeer walked up to the complainant, grabbed her by the shoulders, "put" her on or "took" her to the ground, and said, "I just need to talk to you." Kassebeer claims that he did not hit the complainant and, in fact, assured her that he would do no such thing, but he did admit to covering her mouth. Kassebeer testified that he grabbed the complainant's cellular phone from her and that, while they were fighting for the

phone, the complainant hit herself on the chin.

When Kassebeer released the complainant, she stood up, whereupon she saw Andrew Kim. Kim confronted her with the blurry photograph ostensibly portraying a sexual act. The complainant told Kim to take a picture of her with her camera in order to demonstrate the poor quality of its photographs. Kim obliged and remarked, "[Y]ou're right, you really can't see anything." The complainant asked Kim why he had brought Kassebeer to her home, to which Kim responded that Kassebeer "just wants closure."

The complainant testified that Kassebeer attempted to remove the complainant's pants to see if her panties were stained with semen. The complainant repeatedly asked Kassebeer and Andrew Kim to leave and attempted to reclaim her phone from Kassebeer. She asserted that, on two such occasions, Kassebeer responded that she was being too loud and moved towards her as though he was about to strike her.

Hashimoto–Matautia testified that, following unsuccessful attempts to contact the complainant by phone, she alerted the police. Officers arrived at the scene between 3:00 and 4:00 a.m., and the complainant told them that she simply wanted Kassebeer and Kim to leave. The complainant's father arrived and drove Kassebeer to the complainant's father's house. The complainant testified that, when she later spoke with Detective Dennis Kim about the incident, she did not tell him that Kassebeer "dropped" her to the ground, but, rather, that he "brought" her to the ground.

3. *The April 10, 2004 afternoon incident*

The next day, April 10, 2004, at approximately noon, Andrew Kim and Freitas met Kassebeer at Krystal Kassebeer's house. Kassebeer, who was still upset about the events of the night before, told Kim and Freitas that he wanted to talk to the complainant and attempted to call her cellular phone, which was apparently turned off. Kassebeer drove with Kim and Freitas to the complainant's residence in Freitas's car.

Upon arrival, Kassebeer entered the residence with Kim and Freitas in order to wait for the complainant so that he could talk to her. Kim received a call from Krystal Kassebeer, who explained that Kim's son, who was staying at her house, had injured his finger. Kim left the residence with Freitas to pick up his son, with the intention of returning to the complainant's residence thereafter.

Kassebeer testified that, while he was waiting alone in the living room, he heard the complainant's truck and saw the complainant through the window blinds. When the complainant entered the residence, she was speaking on the cellular phone. Kassebeer testified that he then panicked because he thought the complainant would start screaming again upon seeing him in the residence, so he went into the bedroom. Kassebeer watched the complainant enter the bathroom and noticed that the complainant had left the front door open, which he found to be strange, so he closed and locked the door. As the complainant exited the bathroom, she observed a shirtless Kassebeer and screamed. From this point, the accounts of the complainant and Kassebeer diverge dramatically.

### a. *The prosecution's witnesses' accounts*

The complainant testified that Kassebeer asked her if she was going to blame him for the injuries to her face. She said that she would not. She informed him that Hashimoto–Matautia was coming and asked him to leave. He replied, "I'll leave after you give me what I want," and proceeded to remove the remainder of his clothes. The complainant begged him to leave, to which he responded by gesturing with his fist in a striking motion, saying, "[Y]ou fucking bitch[. S]hut the fuck up[. G]et on the bed." Kassebeer pushed her onto the bed, where he took off her pants and underwear. The complainant tried in vain to repel Kassebeer with her forearm, but Kassebeer inserted his penis into her vagina. Kassebeer engaged in approximately two minutes of intercourse, during which he fondled one of the complainant's breasts.

Just then, Hashimoto–Matautia arrived at the front door, which was locked. Hashimoto–Matautia knocked on the door intermittently for four minutes. The complainant testified that she ran to answer the door without putting on her pants, opening the door only slightly. Hashimoto–Matautia noticed that the complainant appeared flushed and terrified. On direct examination, Hashimoto–Matautia testified that the complainant said, "[O]h, my gosh, call the cops, [Kassebeer] just beat me," but, on cross-examination, Hashimoto–Matautia clarified that the complainant actually said, "[Kassebeer] raped me." The complainant likewise testified that she told Hashimoto–Matautia that Kassebeer had raped her and had asked Hashimoto–Matautia to call the police. Hashimoto–Matautia testified that, as she turned to use the phone, she observed Kassebeer lurking behind the complainant. Kassebeer slammed the door shut and locked it.

Hashimoto–Matautia testified that she then called the police and reported that the complainant had been raped. Meanwhile, Kassebeer took the complainant into the bedroom, where he demanded that the complainant contact Hashimoto–Matautia to see if she had called the police. The complainant complied, using the speakerphone. Hashimoto–Matautia testified that, when she received the call, she sensed that Kassebeer was listening to the conversation, so she claimed that she had merely called a friend. Hashimoto–Matautia recalled the complainant responding, "[O]kay. I just wanted to know. I'll be out there shortly." Hashimoto–Matautia again called the police and asked that the officers hurry. In the residence, the complainant stated to Kassebeer that she wanted to leave, but he directed her to get on the bed. The complainant also told Kassebeer that she would act like nothing had happened and that they were going to lunch. The complainant said that Kassabeer was unpersuaded, stating, "I know once we get out there, you're going to change, you're going to act different." The complainant attempted to flee through the sliding door of the bedroom, but Kassebeer caught her and proceeded to barricade the door using a dresser.

The complainant testified that a police siren passed the apartment, which prompted Kassebeer to call Hashimoto–Matautia. Kassebeer asked Hashimoto–Matautia, "[D]id you call the fucking cops[? Y]ou think I['m] fucking stupid?" Hashimoto–Matautia replied, "[N]o, why? Should I call the cops?" Kassebeer responded, "I got [the complainant] barricaded in the room. You want to make this a hostage situation, I'll make this a hostage situation." Kassebeer added, "[I]f you called the cops, you're going to regret this for the rest of your life.... [T]his is something you're going to have to live with for the rest of your life." After his conversation with Hashimoto–Matautia, Kassebeer phoned Andrew Kim.

The complainant and Andrew Kim provided testimony to the following effect: Prior to this incident, Kim had taken Kassebeer's handgun and dismantled it because he knew that it was not in Kassebeer's best interest to have possession of any kind of weapon in his state of depression. During Kassebeer's phone call to Kim, Kassebeer said: "[R]emember the thing that you thought you hid from me? Hah, Hah, I know where you put it. It was in the washer on the top shelf, I saw you...." Kassebeer then began to speak specifically and expressly about his gun. He told Kim that he "had his gun." He also said to Kim that "this is going to be a hostage situation and the only person who can negotiate me out of this is you." Kim believed, during the call, that he heard the complainant either screaming or arguing in the background. According to the complainant, she was calling for Kim's assistance, pleading, "[P]lease, please, [Kim], [Kim], help." She testified that she wanted to leave the room, but that she remained because Kassebeer had just raped her and the next step would be for him to kill her.

### b. *Kassebeer's account*

Kassebeer testified to a very different version of the incident. Upon being discovered by the complainant as she exited the bathroom, Kassebeer said that he did not want any trouble and that he just wanted to talk. The complainant walked past Kassebeer into the bedroom. She asked Kassebeer what he wanted to talk about, and they discussed how she had received the injuries to her face. Kassebeer broke down crying, claiming that his life was falling apart. The complainant approached him and started hugging and kissing him, assuring him that "it's going to be all right." Kassebeer did not force the complainant to take off her pants. If fact, she even joked that her underwear did not have any stains, ostensibly referencing Kassebeer's accusation during the early morning incident that the complainant's underwear exhibited stains from sexual activity. The two engaged in consensual sexual intercourse, in which he was not forceful towards the complainant. During the activity, Kassebeer heard a pounding at the front door. The complainant said, "[H]urry up, that's [Hashimoto–Matautia]." The complainant put on her bra, top, and pants before answering the door.

Kassebeer walked to the hallway, where he saw Hashimoto–Matautia through the doorway. Hashimoto–Matautia was on the phone and gave Kassebeer "a strange look like she was puzzled to see [him]" before walking away to the parking lot. The complainant closed the door and walked past Kassebeer into the bedroom. The complainant said that she was going to lunch with Hashimoto–Matautia and that she did not want to talk with Kassebeer at the moment. Kassebeer suspected that Hashimoto–Matautia was calling the police and asked the complainant to call Hashimoto–Matautia to dispel his fear. After listening to the complainant's conversation with Hashimoto–Matautia, in which Hashimoto–Matautia denied calling the police, Kassebeer thought that she was lying, so he called her himself. Kassebeer asked her whether she had called the police and said that, if she had, it showed that she did not care about the complainant or the complainant's marital relationship.

After the phone call with Hashimoto–Matautia, the complainant suggested that Kassebeer come to lunch with her and Hashimoto–Matautia to discuss matters. Kassebeer did not want to go with Hashimoto–Matautia, so the complainant suggested that they eat lunch together with their children the following day, Easter Sunday. Kasse-

beer was still upset, so he called Andrew Kim. He told Kim that he was angry and that he just wanted "an end to this." Kassebeer stated that he wished to know whether the complainant wanted to work on their relationship or to move on. Kassebeer testified that he did not intend for this statement to alarm anyone; he just wanted closure. Kassebeer also testified that he did not intend to use the handgun that he had hidden underneath the bed the night before and that he never brought it out during the incident.

### 4. *The police's arrival and investigation*

Hashimoto–Matautia testified that the police arrived approximately fifteen minutes after she called. An officer asked her if Kassebeer had any weapons, and she told him that Kassebeer owned a handgun. The police also asked her to call the residence's home phone and tell Kassebeer and the complainant that they should open the door, or else the police would knock it down. Kassebeer answered the phone and angrily repeated that Hashimoto–Matautia would regret calling the police. She relayed the police's message to Kassebeer. The police banged on the front door, which prompted the complainant to open the door. Hashimoto–Matautia recalled that the complainant looked terrified and proceeded to cling to her. Kassebeer came through the front door shirtless and was seized by the police.

Officer Donato testified that she responded to a call from the complainant's residence on April 10, 2004. Officer Donato observed that the complainant appeared to have injuries to her face and arms and seemed distraught. At trial, the complainant testified that she received the bruises on her forearm and between her legs during the afternoon incident, but that the bruises on her chin and shoulder were sustained during the early morning incident. The complainant admitted on cross-examination that the bruises on her arms may have resulted from playing with her children. The complainant testified that she initially stated in her conversation with Officer Donato, "[E]verying's okay, everything's okay, we're all okay, you guys can leave." But, after Officer Donato escorted the complainant into the house, the complainant broke down. She grabbed the officer's arms and pleaded with the officer not to leave her alone. The complainant told Officer Donato what had happened to her. The officer asked the complainant where Kassebeer's handgun was located, but the complainant did not know. After her discussion with the complainant, Officer Donato conducted a search of the bedroom and bathroom for weapons. The officer testified that she discovered a loaded Glock 26 handgun underneath the bed between the mattress and the box springs.

Detective Dennis Kim testified that he interviewed the complainant on April 11, 2004. He observed that the complainant appeared nervous and traumatized during the interview. Detective Kim also interviewed Andrew Kim, who told the detective that he thought Kassebeer was going to "take it to the extreme" by kidnapping the complainant and forcing her to reveal the identity of the person with whom she was having an affair. Andrew Kim also thought that Kassebeer might harm the complainant or end his pain by killing himself.

### 5. *Dr. Tan–Salle's examination*

Kassebeer called Dr. Tan–Salle to testify regarding her examination of the complainant at Kapiolani Medical Center on April 10, 2004. Dr. Tan–Salle performed a medical exam, as well as a forensic exam, in order to search for evidence of sexual assault. Dr. Tan–Salle recalled that the complainant appeared "very shaken" and "very disheveled" at the examination. She also noted in her report that the complainant appeared fearful, anxious, and frightened. Dr. Tan–Salle testified to the contents of the report she prepared, which indicated, *inter alia,* that: (1) the complainant stated that she had not been fondled; (2) the complainant reported that she had received blows to the forearm or neck and indicated that she had been grabbed on the arm and neck; (3) Dr. Tan–Salle did not find any injuries to the complainant's neck; (4) the complainant was experiencing vaginal discharge and bleeding; (5) the vaginal bleeding may have been related to her recent menstrual period; (6) the

complainant experienced pain in her chin, inner arm, and inner thigh; and (7) the complainant had bruises on her eye, inner thigh, and back, as well as a cut on her lip. Dr. Tan–Salle performed a pelvic examination of the complainant's genitals, which did not reveal any abnormal lesions, trauma, or bruising.

On cross-examination by the prosecution, Dr. Tan–Salle explained that it is not uncommon for there to be no trauma to the vagina in a sexual assault case.

### B. *Kassebeer's Objection To The Admission Of The Handgun Into Evidence*

The prosecution moved to enter into evidence State's Exhibit 11, the handgun with a magazine and ammunition, prior to resting its case. Kassebeer objected on the grounds of relevance, prejudice, and inadequate foundation.[5] The circuit court overruled Kassebeer's objection, received the exhibit into evidence, and published it to the jury.

### C. *Kassebeer's Motions For Mistrial*

During the trial, Kassebeer made three motions for a mistrial on the grounds that prosecution witnesses had violated the circuit court's order *in limine* not to discuss Kassebeer's prior acts of violence against the complainant. The first motion was made in response to Hashimoto–Matautia's testimony on redirect that "[Kassebeer] kept saying, ['O]h, what, your other boyfriend did that to you, huh? Oh, what, you leave me because I hit you, and you go to somebody else who hit you?[']" Kassebeer promptly objected to the testimony and moved for a mistrial. The circuit court declined to grant a mistrial, but struck the testimony from the record and instructed the jury that, "[w]hen the [c]ourt strikes an answer, you are to disregard it and not consider it in any way in your deliberations of this case."

Next, on direct examination, the complainant was asked why, at the time of the incidents, she had not filed the paperwork for her divorce. The complainant responded, "Because he was trying to say he would

change, he wouldn't hit me anymore[.]" Kassebeer again objected and again requested a mistrial. The circuit court declined to grant a mistrial, struck the answer from the record, and again instructed the jury not to consider the response in its deliberations. Moments later, still on direct examination, the complainant stated that Kassebeer had accused her of having "another boyfriend to abuse me." Kassebeer again moved for a mistrial, which was again denied by the circuit court. The circuit court struck the complainant's answer from the record, and again admonished the jury to disregard the answer and not to consider it in its deliberations. Following a brief recess, the circuit court gave a further instruction to the jury:

> Ladies and gentlemen, the [c]ourt had struck certain testimony by this witness prior to the recess. I want to remind you that you're not here to decide whether the defendant was a good husband or a bad husband. You're here to decide whether the [s]tate has proven beyond a reasonable doubt that the defendant committed the crimes that he is charged with, and you are to do this dispassionately. That is, without passion, or objectively.

After resting his case, Kassebeer renewed his motion for a mistrial. The circuit court again denied the motion.

### D. *Verdict and Sentencing*

At the close of the evidence, the circuit court administered the jury instructions, and the parties presented their closing arguments. Following its deliberations, the jury returned a verdict of guilty as to the charges of first degree sexual assault and kidnapping. The jury was unable to reach a unanimous verdict regarding the charge of third degree sexual assault; therefore, the circuit court declared a mistrial as to that count. On November 16, 2005, Kassebeer was sentenced to twenty years' imprisonment with respect to the first degree sexual assault and ten years' imprisonment with respect to kidnapping, the two sentences to run concur-

---

**5.** Kassebeer does not argue on appeal that the foundation for the firearm, magazine, and am- munition was inadequate.

rently. On December 12, 2005, Kassebeer filed a timely notice of appeal.

### E. *Appellate Proceedings*

On appeal before the ICA, Kassebeer argued that the circuit court erred in: (1) admitting the handgun into evidence, on the grounds that it was prejudicial and not relevant; (2) denying Kassebeer's motion *in limine* to exclude as a prior bad act evidence of the incident in the early morning of April 10, 2004; (3) failing to include a unanimous verdict instruction as to the charge of kidnapping; (4) referring to "the offense," as opposed to "the alleged offense"; (5) preventing Kassebeer from effectively confronting and cross-examining prosecution witnesses by (a) denying Kassebeer the opportunity to cross-examine Officer Donato regarding the complainant's injuries and (b) preventing Kassebeer from questioning the complainant about the statements she made in an interview with Detective Kim; and (6) failing to grant Kassebeer's motions for a mistrial.

The ICA issued a memorandum opinion on February 29, 2008, which found each of Kassebeer's points of appeal to be meritless. Accordingly, the ICA affirmed the judgment of the circuit court. ICA's mem. op. at 16. On March 28, 2008, the ICA filed its judgment on appeal.

On May 29, 2008, Kassebeer filed a timely application for a writ of certiorari. This court accepted the application on July 8, 2008 and heard oral argument on September 4, 2008.

## II. *STANDARDS OF REVIEW*

### A. *Application For A Writ Of Certiorari*

The acceptance or rejection of an application for a writ of certiorari is discretionary. HRS § 602–59(a) (Supp.2007). In deciding whether to grant the application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[ ] or (2) [o]bvious inconsistencies ... with [decisions] of th[is] court, federal decisions, or [the ICA's] own decision[s]" and whether "the magnitude of those errors or inconsistencies

dictat[es] the need for further appeal." HRS § 602–59(b).

### B. *Evidentiary Rulings*

This court generally reviews the circuit court's evidentiary rulings for an abuse of discretion, unless there can be but one correct answer to the question of admissibility, in which case this court's review is *de novo.* *See State v. Duncan,* 101 Hawai'i 269, 273–74, 67 P.3d 768, 772–73 (2003).

### C. *Jury Instructions*

"The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Balanza,* 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000). "[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Sua,* 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999). In other words, [e]rror is not to be viewed in isolation and considered purely in the abstract.

*State v. Mainaaupo,* 117 Hawai'i 235, 247, 178 P.3d 1, 13 (2008) (citations omitted).

### D. *Improper Comment On The Evidence*

In a jury trial, "[t]he court ... shall not comment upon the evidence." HRE Rule 1102.

### E. *Right To Confront Witnesses*

The confrontation clause of article I, section 14 of the Hawai'i Constitution directs that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused...." This court has further held that "the right of confrontation 'affords the accused both the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses.'" *State v. Fields,* 115 Hawai'i 503, 512, 168 P.3d 955, 964 (2007) (citing *State v. Ortiz,* 74 Haw. 343, 360, 845 P.2d 547, 555 (1993)).

### F. Harmless Error

■ " 'In applying the harmless-beyond-a-reasonable-doubt standard, the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.' " *State v. Peseti*, 101 Hawai'i 172, 178, 65 P.3d 119, 125 (2003) (quoting *State v. Balisbisana*, 83 Hawai'i 109, 113–14, 924 P.2d 1215, 1219–20 (1996)) (brackets omitted).

### G. Motion For A Mistrial

■ This court reviews the circuit court's decision with respect to a motion for a mistrial for an abuse of discretion. *See State v. Lagat*, 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002).

### III. DISCUSSION

### A. The ICA Did Not Err In Affirming The Circuit Court's Admission Of The Handgun Into Evidence.

Kassebeer argues that the circuit court erred in admitting into evidence, over his objection, a handgun that he urges was irrelevant to proof of the elements of the offenses with which he was charged, and that, assuming the handgun had some relevance to the issues at trial, its probative value was substantially outweighed by the danger of "unfair prejudice, confusion of the issues or misleading the jury," as explicated by HRE Rule 403. Kassebeer seems to argue further that the circuit court abused its discretion by allowing the handgun, magazine and ammunition into the jury room, inasmuch as such items "carr[y] enormous power and [are] significantly prejudicial in [their] impact where more relevant evidence is evenly balanced."

■ As noted by the ICA, Kassebeer did not object to the voluminous testimony given regarding the origins of the handgun and its retrieval from the residence. ICA's mem. op. at 7. Instead, Kassebeer only raised his objection at the conclusion of the prosecu-

tion's case-in-chief, when the prosecution moved the handgun, magazine, and ammunition into evidence. While it is unclear whether Kassebeer is challenging the admissibility of the testimony regarding the handgun, we hold that Kassebeer waived his right to challenge such testimony due to his failure to object to it. *See* HRE Rule 103(a)(1).[6] Nevertheless, assuming *arguendo* that Kassebeer did not waive his objection, we review whether the testimony was unduly prejudicial.

Kassebeer initially brought the handgun to the residence during the early morning incident because he "didn't know what to expect." While the complainant was in the residence with Kassebeer after the alleged sexual assault, Kassebeer telephoned Andrew. Kim and said, "[R]emember that thing that you hid from me? Hah, hah, I know where you put it." Kassebeer proceeded to make statements to Kim about his gun. Kassebeer specifically stated that he "had his gun." He also told Kim, "[T]his is going to be a hostage situation and the only person who can negotiate me out of this is you." The complainant did not attempt to leave the room because Kassebeer had just raped her and the next step would be for him to kill her. In light of the facts that the complainant was aware that Kassebeer possessed a handgun, that Kassebeer told Kim during their telephone conversation that he had his gun, that Kassebeer stated that there was going to be a "hostage situation," and that the complainant did not leave the room because she believed that Kassebeer would kill her if she tried, it is apparent that the handgun had significant probative value with respect to the charged offenses.

As the ICA stated, from the evidence, "the jury could reasonably infer that Kassebeer had planned to rape and kidnap the [complainant] and had brought the gun to embolden himself and as protection should he encounter resistance from the [complainant] or others." ICA's mem. op. at 8. The jury also could have concluded that Kassebeer brought

---

6. HRE Rule 103(a)(1) provides in relevant part:
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and: .

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

the handgun in order to coerce and terrorize the complainant. *See* HRS §§ 707–720(1)(e) and 707–730(1)(a). Kassebeer is correct that a firearm in a jury room can "carr[y] enormous power." Nonetheless, the handgun constituted a significant piece of evidence pertaining to the state of mind requisite to the charged offense of kidnapping-with-intent-to-terrorize. Accordingly, the circuit court's admission of testimony regarding the handgun was not erroneous, because the testimony's probative value outweighed any potential prejudice. *See* HRE Rule 403; *United States v. Touloumis*, 771 F.2d 235, 239–40 (7th Cir.1985) (holding, in a prosecution for the defendant's use of extortionate means to collect an extension of credit, that the district court did not abuse its discretion under Federal Rules of Evidence Rule 403 in admitting a handgun found in the ankle holster of a third party who had been sent by the defendant to collect a gambling debt from the complainant, despite the fact that the gun had never been shown to the complainant, because the gun was probative of the third party's intent to threaten the complainant and because the defendant could be found guilty of using extortionate means to collect credit through the third party's actions).

Kassebeer also seems to argue that the circuit court erred in allowing the handgun into the jury room. A trial court's decision to allow physical evidence that is "nontestimonial in nature" into the jury room "'should be governed by ... [whether] the sound discretion of the trial judge dictates that [the evidence] bear[s] directly on the charge.'" *State v. Robinson*, 79 Hawai'i 468, 473, 903 P.2d 1289, 1294 (1995) (quoting *People v. Caldwell*, 39 Ill.2d 346, 236 N.E.2d 706, 714 (1968)). As noted, the handgun was relevant to the kidnapping charge against Kassebeer and potentially illuminated Kassebeer's requisite state of mind. Moreover, although a handgun in a jury room may carry "enormous power," there is nothing in this court's jurisprudence that expressly prohibits a trial court from allowing a jury to examine weapons properly admitted into evidence, and other jurisdictions have determined that the trial court has discretion to allow such an examination. *See Robinson v. State*, 52 Wis.2d 478, 190 N.W.2d 193, 196

(1971); *State v. Thompson*, 326 N.W.2d 335, 337 (Iowa 1982). Accordingly, we hold that the circuit court did not abuse its discretion in allowing the handgun into the jury room.

### B. *The ICA Did Not Err In Concluding That The Circuit Court Correctly Denied Kassebeer's Motion In Limine To Exclude Evidence Of The Early Morning Incident On April 10, 2004.*

Kassebeer argues that the circuit court abused its discretion by denying his motion *in limine* to exclude evidence of his alleged physical abuse of the complainant that occurred during the early morning incident on April 10, 2004 as a prior bad act, pursuant to HRE Rule 404(b). The rule provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but that such evidence "may ... be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident."

In the present matter, the ICA concluded that evidence of the early morning incident, which took place approximately ten hours before the charged sexual assaults and kidnapping, was probative of Kassebeer's "motive" in committing the offenses, because the evidence illustrated that he was obsessed with and enraged by his belief that his wife was having an affair. *See* ICA's mem. op. at 10; HRE Rule 404(b); *see also* HRS §§ 707–730(1)(a) and 707–720(1)(e). The ICA also concluded that the early morning incident was relevant to the complainant's state of mind and to whether she was subject to strong compulsion, had consented to the sexual intercourse, and was involuntarily restrained. *See* ICA's mem. op. at 10. We believe that those matters were plainly "of consequence" to the issues presented by the sexual assault and kidnapping charges. *See* HRE Rule 404(b); HRS §§ 707–730(1)(a) and 707–720(1)(e).

██ Kassebeer does not dispute that the evidence of the early morning incident was relevant to those issues under HRE Rule 404(b). Instead, he asserts that the probative value of the evidence of the early morning incident was substantially outweighed by the danger of unfair prejudice. Kassebeer's balancing analysis is implicit in HRE Rule 404(b)'s directive that evidence of a prior bad act "may" be admissible; the rule's use of the word "may" was intended to trigger an inquiry under HRE Rule 403, *cf.* commentary on HRE Rule 404, which provides in relevant part that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *See also State v. Renon,* 73 Haw. 23, 31–32, 828 P.2d 1266, 1270 (1992).

██ On one side of the scale, Kassebeer maintains that the evidence of the early morning incident is of "little if any" probative value, insofar as the incident occurred roughly ten hours before the charged sexual assault and kidnapping. The passage of time diminishes the probative value of prior bad act evidence. *See State v. Sweat,* 362 S.C. 117, 606 S.E.2d 508, 515–16 (Ct.App.2004); *cf. Territory v. Hays,* 43 Haw. 58, 64 (1958) (holding that, in a statutory rape case, a physician's testimony of the physical condition of the complainant is of great probative value where the examination is made immediately or soon after the alleged offense, but that its probative value decreases with the passage of time). Nevertheless, in the present matter, we do not believe that the ten hours that passed between the early morning incident and the time that the charged offenses took place undermined the probative value of the early morning incident in any meaningful way. *See Sweat,* 606 S.E.2d at 515–16 (holding that the probative value of evidence of prior domestic abuse that occurred before the events that gave rise to the

defendant's burglary and assault and battery convictions was not reduced by the fact that the prior abuse had occurred two months before those events).

██ On the other side of the scale, Kassebeer contends that the probative value of the early morning incident is substantially outweighed by the danger of unfair prejudice to his right against self-incrimination and his right to rely upon the defense of reasonable doubt, as guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution.[7] Kassebeer misapprehends the meaning of the term "unfair prejudice." *See* HRE Rule 403. Evidence is unfairly prejudicial when it has " 'an undue tendency to suggest decision on an improper basis.' " *Kamaka v. Goodsill Anderson Quinn & Stifel,* 117 Hawai'i 92, 116, 176 P.3d 91, 115 (2008) (quoting Commentary on HRE Rule 403 (1993)). Kassebeer's argument is not that the evidence probably caused the jury to find him guilty for an improper reason,[8] but, rather, that the evidence was so probative that he felt compelled to take the stand so that he could give his side of the story. Thus, while the evidence was potentially damaging, Kassebeer has not established that its admission was in any way "unfair." *See* HRE Rule 403; *State v. Klafta,* 73 Haw. 109, 115, 831 P.2d 512, 516 (1992) ("Probative evidence always 'prejudices' the party against whom it is offered since it tends to prove the case against that person."); *United States v. Paredes,* 87 F.3d 921, 925 (7th Cir.1996) (holding that the district court did not err in allowing evidence of the defendant's prior convictions of impersonating police officers to show her intent, knowledge, plan, preparation, and identity in a prosecution for impersonating an FBI agent, because, although the evidence was particularly damning, its damning nature did not render it unfairly prejudicial).

---

7. *See* Haw. Const. art. I, § 5 ("No person shall be deprived of life, liberty or property without due process of law...."); Haw. Const. art. I, § 14 ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury....").

8. *See State v. McCrory,* 104 Hawai'i 203, 207, 87 P.3d 275, 279 (2004) (holding that the circuit

court abused its discretion, under HRE Rule 403, in admitting a defendant's cellmate's testimony that the defendant failed to expressly proclaim his innocence, because the jurors could have assumed that the defendant would have professed his innocence to his cellmate if he were not guilty).

To summarize, Kassebeer has failed to show that the circuit court abused its discretion in determining that the probative value of the early morning incident was not substantially outweighed by the danger of unfair prejudice. *See State v. Plichta,* 116 Hawai'i 200, 221, 172 P.3d 512, 533 (2007) (" 'The burden of establishing abuse of discretion is on appellant and a strong showing is required to establish it.' " (quoting *State v. Kido,* 109 Hawai'i 458, 461, 128 P.3d 340, 343 (2006))). We therefore agree with the ICA that the circuit court did not abuse its discretion in denying Kassebeer's motion *in limine. See* ICA's mem. op. at 11–12.

C. *The ICA Erred In Affirming The Circuit Court's Failure To Provide A Specific Unanimity Instruction To The Jury Regarding The Charge Of Kidnapping.*

Kassebeer argues that reversible error was committed when the circuit court chose not to issue, *sua sponte,* a specific unanimity instruction to the jury concerning the charge of kidnapping. In response to Kassebeer's claim, the prosecution proffers a pair of counterarguments: (1) a specific unanimity instruction was not necessary because the prosecution effectively elected the specific act upon which it relied to establish the conduct element of the kidnapping charge; and (2) the jury could not have found Kassebeer guilty of kidnapping merely due to his holding the complainant down in the early morning hours of April 10, 2004, because there was no evidence that he did so with any of the mental states required by the kidnapping statute, HRS § 707–720. *See supra* note 2.

In *State v. Arceo,* 84 Hawai'i 1, 928 P.2d 843 (1996), this court held that, when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) *at or before the close of its case-in-chief,* the prosecution is required to elect the specific act upon which

it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.,* an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at 32–33, 928 P.2d at 874–75 (emphasis added). Although *Arceo* was concerned with sexual assault, the requirement expressed therein has been discussed in cases involving a variety of offenses where multiple acts and jury unanimity were at issue. *See, e.g., State v. Rapoza,* 95 Hawai'i 321, 328–30, 22 P.3d 968, 975–77 (2001) (holding that the act of discharging a firearm multiple times did not amount to "separate and distinct culpable acts" requiring an *Arceo* instruction); *State v. Valentine,* 93 Hawai'i 199, 208–09, 998 P.2d 479, 488–89 (2000) (stating that, although the defendant made multiple attempts to wrest control of an officer's sidearm, the actions comprised only a single episode that did not mandate an *Arceo* instruction). Moreover, according to *Valentine,*

two conditions must converge before an *Arceo* unanimity instruction, absent an election by the prosecution, is necessary: (1) at trial, the prosecution adduces proof of two or more separate and distinct culpable acts; and (2) the prosecution seeks to submit to the jury that only one offense was committed. Moreover, it bears repeating that the purpose of an *Arceo* unanimity instruction is to eliminate any ambiguity that might infect the jury's deliberations respecting the particular conduct in which the defendant is accused of engaging and that allegedly constitutes the charged offense.

93 Hawai'i at 208, 998 P.2d at 488.

In this case, the prosecution claims that, by solely referencing the latter of the two events that took place on April 10, 2004 in its closing argument, a *de facto* election of the specific act was effected. However, in *State v. Maumalanga,* 90 Hawai'i 58, 976 P.2d 372 (1998), this court indicated that more was required to effectuate an election of the particular conduct upon which a charge is based. In *Maumalanga,* the de-

fendant's conviction of place to keep loaded firearm, in violation of HRS §§ 134–6(c) and (e) (1993), was upheld in spite of his argument that

> there was evidence that [the defendant] took the guns from his home to his work place. Then, [the defendant] took one of the guns from the work place to pick up his friends to take them home. Based on these facts, ... there were two episodes which could be deemed to be "separate and distinct culpable acts." Under *Arceo*, the prosecution must elect ... which of the two episodes upon which it is relying to establish the "conduct" element of the charged offense or the court must instruct the jury on the requirement of an unanimous verdict as to the underlying conduct.

*Id.* at 63, 976 P.2d at 377. In affirming the ICA's decision, this court explained the means by which the prosecution successfully elected the specific conduct that supported the charge against the defendant as follows:

> In its cross-examination of [the defendant] and in closing argument, the prosecution focused its development of the facts and its argument on [the defendant's] conduct in taking the loaded firearm with him when he left his workplace to take his friends home and when he stopped for gas. No attempt was made to question [the defendant] whether his firearms were loaded or enclosed in containers when he transported them from his home to [his workplace]. Instead, he was questioned regarding the condition of the firearm at the gas station and whether he knowingly took it with him when he departed from his place of business. Similarly, in closing argument, the prosecution stated, "Defendant told you that [the gun] was in his waist[ ]band because, remember, when he was in the car, he remembered the gun was in his waist[ ]band and he told you he pulled it out," thereby clearly focusing on [the defendant's] transportation of the firearm to the gas station. Accordingly, inasmuch as *no* effort was made to develop the facts necessary to establish a violation of HRS § 134–6 with regard to the period in which [the defendant] transported his firearms from his home to his place of business *or* to argue that the aforementioned act con-

stituted a violation, we hold, on the present record, that the prosecution made an effective election, in satisfaction of the *Arceo* requirements, to base its charge of place to keep loaded firearm on [the defendant's] conduct in taking the firearm from his workplace to the gas station where the shooting incident occurred.

*Id.* at 64, 976 P.2d at 378 (some brackets added and some in original) (some emphasis added and some in original).

In contrast to *Maumalanga*, the prosecution in this case included conduct by Kassebeer in its development of the facts that could serve as a basis for multiple instances of kidnapping. Considering that the prosecution opposed Kassebeer's motion *in limine* to have the early morning event of April 10, 2004 excluded from the trial and then subsequently questioned the complainant and Kim, in detail, as to the incident, it would seem impossible for the prosecution now to argue that "*no* effort was made to develop the facts necessary to establish" the earlier event as a separate, culpable act which would in turn necessitate the circuit court's issuance of an *Arceo* unanimity instruction. *See id.* (emphasis in original). Therefore, while the prosecution in the present case avoided reference to the separate, culpable act in its closing argument (as did the prosecution in *Maumalanga*, 90 Hawai'i at 64, 976 P.2d at 378), the decision to elicit testimony developing the facts of the early morning incident of April 10, 2004 effectively trumps the silence that followed because the prosecution's election of the specific act must take place "*at or before the close of its case-in-chief*," *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (emphasis added), thereby rendering insufficient its attempt to do so during closing arguments. Therein lies the difference between the effective election in *Maumalanga* and the abortive attempt made by the prosecution in the current appeal.

█ In any event, the prosecution's closing argument, without more, cannot take the place of a specific unanimity instruction because,

> just as arguments of counsel cannot substitute for evidence, *State v. Quitog*, 85 Ha-

wai'i 128, 144, 938 P.2d 559, 575 (1997), so too may they not cure defects in jury instructions[.] Arguments by counsel cannot substitute for an instruction by the court. Arguments by counsel are likely to be viewed as statements of advocacy, whereas a jury instruction is a definitive and binding statement of law. *State v. Perkins*, 243 Wis.2d 141, 626 N.W.2d 762, 773 (Wis.2001).

*State v. Nichols*, 111 Hawai'i 327, 340 n. 8, 141 P.3d 974, 987 n. 8 (2006).

■ Alternatively, the prosecution argues that the jury could not have determined that the evidence of the early morning event established the elements of the kidnapping charge. We believe that the prosecution is mistaken. The testimony of Andrew Kim and the complainant regarding the incident could establish the elements of HRS § 707–720(1)(e). On direct examination, the complainant testified to the following:

> [Prosecutor]: What happened, if anything, when you got home?
>
> [Complainant]: I opened the door, I was talking to [Hashimoto–Matautia], and then I went into my hallway, and then all of a sudden [Kassebeer] is magically in my hallway, grabs me from the back, drops me to the ground, hits my head against the tile and tells me ["]who are you fucking, who are you fucking,["] grabs the phone away from my ear and hits it across my chin, and asks me who am I fucking. And then [Kassebeer] tells [Kim]: ["Kim], [Kim], [Kim], come. Bring the pictures, bring the pictures.["]
>
> [Prosecutor]: Now, when [Kassebeer] is doing this, what [are] his emotions like?
>
> [Complainant]: Angry and psychotic.
>
> [Prosecutor]: Now, he's telling [Kim], ["Kim], [Kim], come bring the pictures.["] Where are you at this time?
>
> [Complainant]: On the ground in the hallway.
>
> [Prosecutor]: And where's [Kassebeer] at?
>
> [Complainant]: On top of me.
>
> [Prosecutor]: And how is he on top of you?
>
> [Complainant]: I'm lying down, and he's on top of me holding me down.

Moreover, Andrew Kim, a prosecution witness and Kassebeer's long-time friend, stated the following on direct examination:

> [Prosecutor]: Mr. Kim, isn't it true that you told Detective Kim that on the following day of his arrest, April 11th, 2004, you said[,] "So she come home, and he grabbed her and threw her to the ground asking who is he, holding her mouth, covering her mouth because she is going to be hysterical."
>
> [Kim]: Yes.

The complainant also testified that Kassebeer threatened to strike her when she attempted to grab her phone. While not as violent as the event that would follow later in the day, the jury could find, based on the foregoing testimony, that Kassebeer "intentionally or knowingly restrain[ed] [the complainant] with intent to" "terrorize" her. *See* HRS § 707–720(1)(e).

The circuit court's instruction regarding the kidnapping count injects further uncertainty as to whether the jury was unanimous with respect to the culpable act constituting the conduct element of the offense. The circuit court instructed the jury, in relevant part, as follows:

> A person commits the offense of [k]idnapping if he intentionally or negligently restrains a person with the intent to terrorize that person.
>
> There are three material elements of the offense of [k]idnapping, each of which the prosecution must prove beyond a reasonable doubt. These three elements are: (1), [t]hat on *April 10, 2004* on the island of Oahu, [Kassebeer] restrained [the complainant]; and, (2), [t]hat [Kassebeer] did so intentionally or knowingly; and (3), [t]hat [Kassebeer] did so with the intent to terrorize [the complainant].
>
> . . . .
>
> "Restrain" means to restrain a person's movement in such a matter as to interfere substantially with his or her liberty by means of force, threats or deception.

(Emphasis added.) While the circuit court instructed the jury as to the *date* of the charged offense, it did not further explicate the *time* of the offense. Accordingly, the

jurors could have found that Kassebeer's culpable acts of either the morning or afternoon of April 10, 2004 established the conduct element of the kidnapping count.

■ Although Kassebeer did not raise a timely objection to the circuit court's failure to provide an *Arceo* instruction or to the prosecution's failure to elect a specific act, this court has noted that

> [w]e may recognize plain error when the error committed affects substantial rights of the defendant. *[S]ee also [State v.] Kinnane*, 79 Hawaiʻi [46,] 50, 897 P.2d [973,] 977 [ (1995) ] ("It may be plain error for a trial court to fail to give an … instruction even when neither the prosecution nor the defendant have requested it … because … the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.")

*Arceo*, 84 Hawaiʻi at 33, 928 P.2d at 875 (citations and quotation marks omitted). Under *Arceo* and its progeny, it was plain error for the circuit court not to issue a specific unanimity instruction to the jury regarding Kassebeer's kidnapping charge. *See, e.g., Arceo* 84 Hawaiʻi at 33, 928 P.2d at 875 (vacating and remanding the circuit court's conviction, because the circuit court plainly erred in failing to provide a specific unanimity instruction to the jury). Accordingly, we hold that the ICA erred in affirming the circuit court's kidnapping conviction under HRS § 707–720.

D. *The ICA Did Not Err In Holding That The Circuit Court Committed No Reversible Error When It Referred To The "Offense," As Opposed To The "Alleged" Offense.*

■ Kassebeer asserts that, before the trial concluded, the circuit court conveyed an assumption that an "offense" had in fact taken place, thereby tainting the jury and precluding the possibility of a fair and impartial trial. The allegedly biased remark was expressed while the circuit court was ruling on an objection to the prosecution's examination of Officer Donato regarding her initial contact with the complainant:

> [Prosecution]: Do you know approximately when the incident happened to her?

> [Kassebeer]: Object, foundation.

> [The court]: Sustained. She has no personal knowledge because she wasn't there at any time of *the offense.* These are all hearsay. You can ask her what she knows. I've sustained the objection already, [Prosecutor], please ask your next question.

> [Prosecution]: From what you know, your personal knowledge, what did she tell you?

> [The court]: Excuse me. Is there any objection?

> [Kassebeer]: Objection, hearsay.

> [The court]: Sustained.

> [Prosecution]: Your Honor, again, this would be [a] hearsay exception.

> [The court]: I've ruled on that matter. I disagree with you. Objection is sustained. You've made your record.

(Emphasis added.)

In *State v. Nomura*, 79 Hawaiʻi 413, 903 P.2d 718 (App.1995), the ICA held that referring to a complaining witness as a "victim" in jury instructions was "inaccurate and misleading," but that, because of curative instructions that were given by the circuit court, the comment "would not have had a substantial influence upon the jury's verdict and thus, the error was harmless." *Id.* at 417–18, 903 P.2d at 722–23. By comparison, the circuit court's miscue in the present matter was far less severe because it was not included as part of any formal instruction to the jury, and, as such, the jury was not forced to contend with inaccurate or misleading instructions. *Cf. State v. Mara*, 98 Hawaiʻi 1, 17, 41 P.3d 157, 173 (2002) (determining "whether the deputy prosecutor's remark amounted to reversible error, the reviewing court considers: (1) the nature of the misconduct; (2) the promptness of a curative instruction or lack of it; and (3) the strength or weakness of the evidence against the defendant"); *State v. Webster*, 94 Hawaiʻi 241, 248, 11 P.3d 466, 473 (2000) (applying the same factors to remarks made by a witness).

Paralleling *Nomura*, the possibility of any misstatement by the circuit court was directly addressed as part of the circuit court's instructions to the jury:

You must also disregard any remarks I may have made, unless the remark was an instruction to you.

If I have said or done anything which has suggested to you that I am inclined to favor the claims or positions of either party, or if any expression or statement of mine has seemed to indicate an opinion relating to which witnesses are or are not worthy of belief, or what facts are or are not established, or what inferences should be drawn therefrom, I instruct you to disregard it.

A hard copy of this instruction was also provided for the jurors to reference during their deliberations.

In addition to explaining what the jury must ignore, the circuit court charged the jury, *inter alia*, with the following affirmative instructions: (1) "You are the exclusive judges of the facts of this case"; (2) "You must presume the defendant is innocent of the charges against him. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt"; (3) "You must consider only the evidence which has been presented to you in this case and such inferences therefrom as may be justified by reason and common sense." In *State v. Hauge*, this court noted that it "has repeatedly adhered to the construct that the 'jury is presumed to have followed the [circuit] court's instructions.'" 103 Hawai'i 38, 59, 79 P.3d 131, 152 (quoting *State v. Cordeiro*, 99 Hawai'i 390, 413, 56 P.3d 692, 715 (2002)) (brackets in original). Based on this precept, the jury is presumed to have given no credence to the judge's off-the-cuff remark.

In summary, in light of the limited extent of the comment, the context in which it was uttered, and the curative and affirmative instructions provided by the circuit court, we cannot say that " 'the record discloses actual bias '... or leaves [us] with an abiding impression that the judge's remark[ ] ... projected to the jury an appearance of advocacy or partiality.'" *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir.2001) (quoting *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.1986)) (some ellipses added and some in original). In short, while the record reflects that the circuit court misspoke, the misstatement did not "result in an unfair trial because the jury instructions cured any impropriety." *Hauge*, 103 Hawai'i at 58, 79 P.3d at 151. We conclude that Kassebeer has not demonstrated that the judge's remarks had a substantial and injurious effect or influence in determining the jury's verdict. *Cf. Hauge*, 103 Hawai'i at 59, 79 P.3d at 152 (holding that "the circuit court's improper comment ... did not amount to reversible error or grounds for a new trial, inasmuch as the court's jury instruction was sufficiently curative"); *Nomura*, 79 Hawai'i at 417–18, 903 P.2d at 722–23 (concluding that the jury instructions in their entirety were sufficient to cure any impropriety resulting from the erroneous use of "victim," as opposed to "witness," in the first instruction).

E. *The ICA Erred In Holding That The Circuit Court Did Not Prevent Kassebeer From Effectively Confronting And Cross–Examining The Complainant.*

Kassebeer argues that the circuit court erroneously prevented him from effectively confronting and cross-examining Officer Donato by allowing her to testify that the injuries she observed on the complainant were consistent with what the complainant had reported, without laying an adequate foundation, and then denying Kassebeer an opportunity to cross-examine her on that subject by sustaining the prosecution's hearsay objection on the ground that Kassebeer had himself failed to lay a sufficient foundation. Kassebeer also contends that the circuit court prevented him from cross-examining the complainant regarding statements that she made to Detective Kim that were inconsistent with her trial testimony and that the circuit court subsequently allowed the complainant to engage in a long, non-responsive, sympathy-rendering narrative over his objection that the narrative was nonresponsive. In support of these points of error, Kassebeer cites only one case, *State v. Furutani*, 76 Hawai'i 172, 873 P.2d 51 (1994), for the proposition that "[t]he inhibition of [Kassebeer's] ability to cross-examine the wit-

nesses[ ] deprived him of his right to a fair trial." While *Furutani* does articulate the general principle that " '[a] fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment [to] the United States Constitution and article I, § 14 of the Hawai'i Constitution,' " 76 Hawai'i at 179, 873 P.2d at 58 (quoting *State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991)), the decision does not deal with the cross-examination of witnesses and therefore does not say what Kassebeer claims it does. Nonetheless, we will address the substance of Kassebeer's claim.

As a preliminary matter, article I, section 14 of the Hawai'i Constitution states in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused...." This court has held that "the right of confrontation 'affords the accused both the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses.' " *Fields*, 115 Hawai'i at 512, 168 P.3d at 964 (quoting *Ortiz*, 74 Haw. at 360, 845 P.2d at 555).

### 1. *Cross-examination of Officer Donato*

Officer Donato testified during the prosecution's direct examination that, upon her arrival at the residence, she witnessed that the complainant had injuries to her face and arms and seemed very distraught. When the prosecution asked Officer Donato what the complainant told her regarding the incident in the residence, Kassebeer successfully objected to the question as calling for inadmissible hearsay. The prosecution then asked Officer Donato whether the complainant's account of the incident in the residence "jived" with her injuries. Kassebeer objected to this question on the ground of insufficient foundation, but was overruled, and Officer Donato answered in the affirmative.

On cross-examination by Kassebeer, Officer Donato was asked, "[I]nsofar as the injuries, do you recall that [the complainant] told you that the injuries that you saw were from a prior incident?" The prosecution objected to the question on the basis that it called

inadmissible hearsay. The circuit court called the parties to the bench, and the following discussion ensued:

[Kassebeer]: I guess this is—there was an incident, [it] was repeated again and again, and hearsay.

[The court]: Excuse me. There was testimony through the state that the injuries that this witness observed [were] consistent with what [the complainant] had reported.

[Kassebeer]: Correct. About the accident, correct.

[The court]: Yes. And you're seeking to elicit testimony that [the complainant] ... had told [Officer Donato] ... that those injuries which [the complainant] had just testified through the state [were] consistent with the allegations that these crimes occurred—

[Kassebeer]: Another incident.

[The court]: It's in rebuttal to your testimony.

[Prosecution]: First of all, ... we can classify it as three different sources of injuries.... We have an old injury that's not related to—

[The court]: Well, I'm trying to expedite this matter. That's a problem, because foundation is which particular injuries you're talking about, because there's three. That being the case, I'm going to sustain the objection. Objection is sustained.

[Kassebeer]: Your Honor, that's inhibiting a significant cross-examination, which certainly—

[The court]: I sustained the objection. You can present it on appeal. Because, again, by your testimony, there's several injuries [that] occurred over different times. There isn't sufficient foundation that what she's talking about is what you're talking about.

[Kassebeer]: I disagree. I think the foundation was laid, and she's associated it with the incident that they arrived there for.

[The court]: I've sustained the objection.

Kassebeer appears to argue that the circuit court's separate foundation rulings were inconsistent and deprived him of his right to confront Officer Donato about her understanding of the source of the complainant's injuries, leaving the jury "with the impression that all the injuries seen by Donato were attributable to the single event that the officer responded to."

■ This court has held that "the determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse." *State v. Loa*, 83 Hawai'i 335, 348, 926 P.2d 1258, 1271 (1996) (quotation marks and citation omitted). Moreover, a defendant has the constitutional right to present any and all competent evidence in his defense. *See State v. Horn*, 58 Haw. 252, 255, 566 P.2d 1378, 1380 (1977). Nevertheless, " 'a defendant's right to present relevant evidence is not without limitation and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996) (quoting *State v. Nizam*, 7 Haw.App. 402, 410, 771 P.2d 899, 904–05 (1989)).

■ After reviewing the circuit court's two foundation rulings at issue, we do not believe that they are inconsistent. The first ruling, wherein the circuit court overruled Kassebeer's foundation objection, stemmed from the prosecution asking Officer Donato, "What she told you, did–did that jive with the injuries that she had?" The second ruling came in response to Kassebeer's asking Officer Donato, "[I]nsofar as the injuries, do you recall that [the complainant] told you that the injuries that you saw were from a prior incident?" The circuit court was correct in allowing the first question by the prosecution, because it did not necessitate knowledge of when each of the complainant's injuries occurred. The question simply asked whether the complainant's account of the afternoon incident to Officer Donato comported with the injuries that Officer Donato observed. This is different from "do you recall that [the complainant] told you that the injuries that you saw were from a prior

incident?" The latter question presupposes "a prior incident," but no foundation had yet been laid for that incident. Accordingly, the circuit court correctly ruled on both objections.

■ We are not persuaded by Kassebeer's argument that, in order to lay the foundation required by the circuit court in his questioning of the complainant, Kassebeer "would have had to query about the hearsay account given by [the complainant] to [Officer] Donato ... which [Kassebeer] had successfully kept out moments before." Kassebeer had other potential avenues of laying the required foundation as to the source of the complainant's injuries, and he was not denied the opportunity to do so. *See Pulse*, 83 Hawai'i at 246, 925 P.2d at 814. Inasmuch as the circuit court did not err in its evidentiary rulings, and Kassebeer had alternative means available of cross-examining Officer Donato, the circuit court did not deny Kassebeer the opportunity to challenge the credibility and veracity of Officer Donato, in violation of his constitutional right of confrontation. *See Fields*, 115 Hawai'i at 512, 168 P.3d at 964.

### 2. *Cross-examination of the complainant*

Kassebeer next claims that the circuit court prevented him from effectively confronting and cross-examining the complainant regarding statements she made to Detective Kim, "which would have shown that she made statements inconsistent with her testimony on direct or included details on direct that she failed to tell ... Detective [Kim] after the incident." Kassebeer takes issue with the following:

> [Kassebeer]: Now, you remember telling Detective Kim when he asked what you said to [Hashimoto–Matautia] when you got to the door, that you believed you'd just been raped?
>
> [Complainant]: Yes.
>
> [Kassebeer]: Okay. Now, there were a lot of questions asked you by Detective Kim, correct?
>
> [Complainant]: Yes.

[Kassebeer]: And you answered them, correct?

[Complainant]: To the best of my ability. But honestly I was—

. . . .

—distraught.

[Kassebeer]: Now, do you remember him asking you if you'd ask[ed Hashimoto–Matautia] to tell the police?

[Complainant]: Honestly, I really don't remember too much of my statement. For one thing, I'm trying to put this behind me[;] I just want it to be over with.

[Kassebeer]: I understand, I understand. But you recall when he asked you that, that you had no response; that is, he asked if you told [Hashimoto–Matautia] to call—

[Complainant]: Well, I know—

[Kassebeer]: Excuse me. He asked you if you told [Hashimoto–Matautia] to call the police, and you had no response?

[Complainant]: Perhaps I nodded or something, but I did tell [Hashimoto–Matautia] to call the police. That I will not forget. Whether it's in my statement or not, I told her to.

[Kassebeer]: And you recall your words when you told her that you had been raped, that you said that you had believed you'd been raped?

[Complainant]: Honestly, I knew that I got raped, but I was just so distraught making my statement. I couldn't believe something like that happened to me.

[Kassebeer]: Okay, now do you recall that you didn't tell him that you told her to help you, that you were afraid or anything like that, right? This is-I'm just asking you what you told Detective Kim.

[Complainant]: I told—well—

[Kassebeer]: *If you want I can refresh your recollection.*

[The court]: Excuse me, let her finish her answer. You may answer.

[Complainant]: With Detective Kim, I was distraught. I really don't know exactly word-for-word what I told Detective

Kim. I know what I had told [Hashimoto–Matautia], and for some reason I'm trying to block it out, but I can't, because I am remembering it.

[Kassebeer]: Okay. But what I'm interested in is what you told Detective Kim and what you remember, and would you like me to—

[Complainant]: Okay. Then would you, please—

[The court]: Excuse me, excuse me. Ask her a question.

[Complainant]: Yes, please.

[Kassebeer]: *Would you like me to show you a copy of the section of the statement that refreshes your recollection about what you said?*

[Prosecution]: Your Honor, I believe that's been asked and answered. She gave her answer.

[The court]: Okay. Sustained.

(Emphases added.)

To summarize, Kassebeer asked whether the complainant remembered reporting to Detective Kim, on the afternoon of April 10, 2004, that she told Hashimoto–Matautia to call the police because she had been raped. The complainant responded that she did not remember. At that point, Kassebeer asked whether reviewing a copy of her statement to Detective Kim would refresh her recollection. The prosecution objected on the ground that Kassebeer's question had been asked and answered. The circuit court sustained the objection.

 The question at issue that Kassebeer posed was whether the complainant's review of her statement would refresh her recollection. Although it appears that the complainant was attempting to say that reviewing her report would refresh her recollection, she never had an uninterrupted opportunity to answer Kassebeer's question. Therefore, we conclude that the circuit court erroneously sustained the prosecution's objection on the basis that the complainant had answered Kassebeer's question. The issue is thus whether the circuit court *reversibly* erred.

HRE Rule 103(a), which pertains to the effect of erroneous evidentiary rulings, pro-

vides in relevant part that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [, i]n case the ruling is one excluding evidence, the substance of the evidence . . . was apparent from the context within which questions were asked." The prosecution essentially argues that Kassebeer's substantial right to confrontation was not affected, because he was permitted to completely pursue his theory that the complainant provided statements to the police that were inconsistent with her testimony. Kassebeer counters that, had the circuit court correctly overruled the prosecution's objection, he would have been able to impeach the complainant's testimony by showing that she made statements that were inconsistent with her testimony on direct or included details on direct that she failed to tell Detective Kim after the incident.

We agree with Kassebeer that the circuit court's ruling significantly impaired his efforts to impeach the complainant's testimony. Although Kassebeer does not identify the specific inconsistencies he sought to emphasize at trial, it is apparent that he was at least attempting to impeach the complainant's testimony, given on direct examination, that she told Hashimoto–Matautia to call the police because she had been raped. Kassebeer was clearly attempting to lay the foundation to show that the complainant's testimony regarding her statement to Hashimoto–Matautia was not credible because she had failed to mention that statement in her interview with Detective Kim. The complainant was the prosecution's key witness, and her credibility was obviously crucial to its case. In order to lay the foundation to introduce a prior inconsistent statement, HRE Rule 613(b) required that Kassebeer bring the circumstances of the statement to the complainant's attention and ask her whether she made the statement. Kassebeer was doing precisely that by initially asking her if she remembered her statement to Detective Kim and by then attempting to refresh her recollection with the statement. Because the circuit court's erroneous ruling inhibited Kassebeer from confronting the complainant with a potential prior inconsistent statement, we hold that

the error adversely affected his substantial right to confrontation. *See* HRE Rule 103(a); *cf. Duncan,* 101 Hawai'i at 279, 67 P.3d at 778 (holding that the erroneous admission of a prior inconsistent statement was not harmless, because the statement undermined the defendant's credibility and credibility was the linchpin of the defenses raised by the defendant).

Given the context of his question, the record thus reflects that, prior to the circuit court's ruling, Kassebeer was attempting to introduce the complainant's prior inconsistent statement regarding whether she had told Hashimoto–Matautia to call the police because she had been raped. Accordingly, the circuit court reversibly erred in sustaining the prosecution's objection.

■ Kassebeer further complains that the trial court erred by subsequently "allowing [the complainant] to engage in [a] long, non-responsive, sympathy rendering[ ] narrative over defense objection." Kassebeer is referring to the following:

[Kassebeer]: Now, do you recall also, just after you didn't respond to Detective Kim's question about whether you had told [Hashimoto–Matautia] to call the police or not, that [the detective] said, "[t]hen what," and then your response was "[w]ell," she said ["]okay["], she said ["]you want to come in[?]" and then apparently you didn't say anything else. Do you recall responding?

[Prosecution]: Objection, Your Honor. Mischaracterizes the transcript.

[The court]: Overruled. I can't tell from here.

[Complainant]: I know that when I told her to call the police, she didn't know what to do. Because she said that . . . she didn't know if it would be better if she stayed outside or if she would come in, because she figured if both of us were inside, he could do anything to us.

[Kassebeer]: Again—

[The court]: Excuse me. Let her finish her answer.

[Kassebeer]: Well—

[Complainant]: I don't know what you're asking me.

[The court]: Counsel, let her finish her answer.

[Kassebeer]: Well, non-responsive, Your Honor.

[The court]: Overruled. You may finish.

[Complainant]: She had told me that she didn't know whether it would be better if she should come in with me and then we'd both be stuck in there with no help, or if it would be better if she'd stay outside. So she didn't know and she felt bad, because she thought maybe she could have, you know, done something to help out or whatnot, and she didn't know if she had done the right thing by staying outside. Because I don't know, either, I just wanted help.

■ A trial court's decision to admit testimony over an objection based on nonresponsiveness requires a "'judgment call'" and is reviewed for abuse of discretion. *See Duncan,* 101 Hawai'i at 273–74, 67 P.3d at 772–73 (quoting *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995)). Strictly speaking, it appears that the complainant's answer was nonresponsive to Kassebeer's question, however inartfully posed, which asked whether the complainant recalled responding to Detective Kim. This court stated in *State v. Hashimoto,* 46 Haw. 183, 195, 377 P.2d 728, 736 (1962), that, "[w]hen an unresponsive or improper answer is given to a proper question, the remedy is a motion to strike," and that, "[a]bsent such motion, the answer will generally not be considered when urged on appeal as prejudicial." (Citation omitted); *see also Steffani v. State,* 45 Ariz. 210, 42 P.2d 615, 617 (1935) (explaining that motion to strike should be made to nonresponsive answer in order to preserve the right to claim error). Although *Hashimoto* did not ultimately rest its holding on this rule, it is applicable here, where Kassebeer failed to move to strike the complainant's nonresponsive answer.

■ Apart from Kassebeer's having failed to move to strike the complainant's answer, it is difficult to discern how the answer was prejudicial. Whereas in *Hashi-*

*moto* a witness's nonresponsive answer referred to a separate bad act committed by the defendant, which was not at issue in the trial, the complainant here simply testified to her and Hashimoto–Matautia's confusion as to what steps to take during the incident. We also note that "responsiveness is not the ultimate test of admissibility" and that, "[i]f an unresponsive answer contains pertinent facts, it is nonetheless admissible; it is only when the unresponsive answer produces irrelevant, incompetent or otherwise inadmissible information that it should be stricken." *State v. Batts,* 303 N.C. 155, 277 S.E.2d 385, 388 (1981) (citations omitted). Here, the complainant's response further clarifies the conversation that occurred at the door of the residence between Hashimoto–Matautia and the complainant following the alleged sexual assault, the details of which Kassebeer had called into question in the context of whether the complainant had told Hashimoto–Matautia that she had been beaten or raped. The response was not irrelevant, incompetent, or otherwise inadmissible.

Nevertheless, inasmuch as the circuit court impaired Kassebeer's right to confront the complainant and abused its discretion by sustaining the prosecution's "asked-and-answered" objection, the ICA erred in affirming the circuit court's judgment.

F. *The ICA Did Not Err In Concluding That The Circuit Court Correctly Denied Kassebeer's Motions For A Mistrial.*

■ Kassebeer contends that the circuit court abused its discretion in denying his motions for a mistrial following Hashimoto–Matautia's and the complainant's improper testimony. In addressing whether witnesses' improper comments warrant a new trial, this court considers "'the nature of the misconduct, the promptness of a curative instruction or lack of it, and the strength or weakness of the evidence against the defendant.'" *State v. Samuel,* 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (quoting *State v. Senteno,* 69 Haw. 363, 366, 742 P.2d 369, 372 (1987)). Kassebeer asserts that Hashimoto–Matautia and the complainant's comments regarding his alleged prior abuse of the complainant

were improper, because the comments violated the circuit court's order *in limine*, which excluded "any testimony from any witness regarding allegations of previous physical abuse of [the] complainant by [Kassebeer]," with the exception of testimony regarding the April 10, 2004 early morning incident. The prosecution does not dispute that the complainant and Hashimoto–Matautia's statements regarding Kassebeer's physical abuse violated the order *in limine* or that the statements were therefore improper. Instead, the prosecution takes the position that the improper statements were harmless, in light of the circuit court's prompt curative instructions to the jury. Kassebeer counters that Hashimoto–Matautia and the complainant's testimony concerning the prior abuse substantially prejudiced his defense, notwithstanding the circuit court's curative instructions. " 'The deliberate and unresponsive injection by prosecution witnesses of irrelevant references to prior arrests, convictions, or imprisonment may generate insurmountable prejudice to the cause of an accused.' " *Loa*, 83 Hawai'i at 353, 926 P.2d at 1276 (quoting *State v. Kahinu*, 53 Haw. 536, 549, 498 P.2d 635, 643 (1972)). Simply put, prosecution witnesses may not hurl "evidential harpoons" at the defendant's case. *See id.*

Kassebeer argues that Hashimoto–Matautia and the complainant intentionally interjected comments regarding his prior physical abuse of the complainant. Before taking the stand, Hashimoto–Matautia and the complainant were each instructed by the prosecution not to testify regarding Kassebeer's alleged abuse of the complainant prior to April 9, 2004. On direct examination, Hashimoto–Matautia testified that, on the night of April 9, 2004 at the Hilton, Kassebeer confronted the complainant with his belief that she was having an affair. On cross-examination, Hashimoto–Matautia testified, in response to Kassebeer's questions, that during the confrontation Kassebeer expressed his concern regarding a bruise near one of the complainant's eyes and a cut on her lip. On redirect examination, the prosecution elicited the following testimony from Hashimoto–Matautia:

Q. [Hashimoto–Matautia], [defense counsel] asked you or said[, "I]sn't it true that [Kassebeer] was concerned about the injuries to [the complainant's] face at the Hilton Hawai'ian Village["]; is that correct?

A. Yes.

Q. How did he express his concern?

A. He seemed more concerned that she had another boyfriend that might have done that to her than the fact that she was actually hurt.

Q. And why do you say that?

A. Because he kept saying, ["O]h, what, your other boyfriend did that to you, huh? Oh, what, you leave me because I hit you, and you go to somebody else who hit you?["]

The complainant testified to a similar account. On direct examination, the complainant recalled that, during the encounter at the Hilton, Kassebeer had accused her of "[h]aving another boyfriend to abuse [her]." The complainant's use of the word "another" implied that Kassebeer had previously abused her. Apart from inquiring into the episode at the Hilton, the prosecution also asked the complainant about the state of her relationship with Kassebeer on April 9 and 10, 2004, which led to the following exchange:

A. We weren't together[;] he was not living in the home; he was living with his sister.

Q. So you two were physically apart, separated?

A. Yes.

Q. Were there any like separation papers filed or anything like that?

A. I had filed for divorce, but I didn't turn in the paperwork yet.

Q. And why not?

A. Because he was trying to say that he would change, he wouldn't hit me any more, he—

Kassebeer insists that the complainant and Hashimoto–Matautia deliberately remarked that he had previously "hit" the complainant.

Although it is true that the prosecution instructed Hashimoto–Matautia and the complainant not to mention the issue of prior abuse, the record does not reflect that either

witness deliberately disregarded those instructions when they testified. They did not speak directly to the issue, but, instead, mentioned it only tangentially in response to the prosecution's lines of questioning. Furthermore, the prejudicial effect of the references did not rise to the level of being insurmountable. *See Reese v. State*, 452 N.E.2d 936, 940 (Ind.1983) (observing that, under the evidential harpoon doctrine, the "gauge ... is not exclusively the way in which the testimony entered the case; but rather, the probable impact of the irregularity upon the verdict is of prime importance"). While the testimony indicated that Kassebeer's physical abuse of the complainant had caused problems in their relationship, it did not reveal the nature or extent of the abuse or any specific details beyond the notion that Kassebeer had, at some point, "hit" the complainant. *Cf. State v. Pokini*, 57 Haw. 17, 19–22, 548 P.2d 1397, 1398–1400 (1976) (holding that jury instructions could not have cured the "highly prejudicial" effect of admitting a transcript from another trial that indicated that the defendant shot and killed a person, intended to frame someone else for the shooting, planned to kill the people who witnessed the shooting, and killed another person). In sum, we do not think that either Hashimoto–Matautia or the complainant deliberately directed an evidential harpoon at Kassebeer so as to cause vital injury to his case.

■ Short of insurmountable prejudice, "'any harm or prejudice resulting to the defendant [from improper remarks] can be cured by the [circuit] court's instructions to the jury,'" because "'it will be presumed that the jury adhered to the [circuit] court's instructions.'" *Samuel*, 74 Haw. at 149 n. 2, 838 P.2d at 1378 n. 2 (quoting *State v. Amorin*, 58 Haw. 623, 629, 574 P.2d 895, 899 (1978)). In the present matter, after each of

the statements by Hashimoto–Matautia and the complainant, the circuit court sustained Kassebeer's objections, struck the statements, and instructed the jury to disregard them. In fact, as discussed above, following the complainant's remark regarding the encounter at the Hilton, the circuit court instructed the jurors as follows:

> Ladies and gentlemen, the [c]ourt had struck certain testimony by this witness prior to the recess. I want to remind you that you're not here to decide whether [Kassebeer] was a good husband or a bad husband. You're here to decide whether the [prosecution] has proven beyond a reasonable doubt that [he] committed the crimes that he is charged with, and you are to do this dispassionately. That is, without passion, or objectively.

In our view, the circuit court's prompt instructions were sufficient to cure any prejudice to Kassebeer that may have arisen from each of the statements by Hashimoto–Matautia and the complainant. *See Samuel*, 74 Haw. at 148–49, 838 P.2d at 1378–79 (holding that any prejudicial effect resulting from the prosecution's expert witness's improper remarks referencing the defendant's prior bad acts, which were made after the witness had been instructed not to make such remarks, were cured by the circuit court's immediate instruction to the jury to disregard the remark); *cf. State v. Kupihea*, 80 Hawai'i 307, 317–18, 909 P.2d 1122, 1132–33 (1996) (holding that, even if the prosecution's hypothetical example during closing argument improperly misstated the law, the circuit court's instruction that counsel's arguments were not evidence cured any prejudice to the defendant).[9] Hence, the ICA correctly concluded that the circuit court did not abuse its discretion in denying Kassebeer's motions for a mistrial. *See* ICA's mem. op. at 12–14.[10]

---

**9.** Because we hold that the instructions were sufficient to cure any prejudice, this court need not address the strength or weakness of the evidence against Kassebeer. *See Samuel*, 74 Haw. at 148, 838 P.2d at 1378.

**10.** Insofar as we hold that Kassebeer should receive a new trial on both counts of which he was convicted, *see supra* in section E.3., E.5, we do not address Kassebeer's final point of error that he was "denied a fair trial ... by cumulative trial

errors at trial where the forensic evidence did not support the prosecution[']s assertion of rape and the case turned mostly on the testimony of [Kassebeer] and [the] complainant." *See State v. Haili*, 103 Hawai'i 89, 93 n. 4, 79 P.3d 1263, 1267 n. 4 (2003) (determining that the issue of cumulative error was moot because the defendant was entitled to a new trial). Although we therefore do not reach the question whether the cumulative effect of the prosecution's witnesses' three violations of the circuit court's order *in*

## IV. *CONCLUSION*

For the foregoing reasons, we vacate the ICA's March 28, 2008 judgment and the circuit court's November 16, 2005 judgment, and we remand this matter for a new trial on the first degree sexual assault and kidnapping counts.

*limine* warranted a mistrial, we emphasize that, on retrial, the prosecution would do well to ensure that its witnesses do not offend the order.